BARLOW & SEELIG MANUFACTURING COMPANY, Respondent, vs. PATCH, Appellant.

*May 9—September 12, 1939.*

221

*Samuel M. Pedrick* of Ripon, attorney, and *A. Trevor Jones* of Chicago, Illinois, of counsel, for the appellant.

For the respondent there were briefs by *Reed, Reed & Born* of Ripon, attorneys, and *Parker, Carlson, Pitzner & Hubbard* of Chicago, Illinois, of counsel, and oral argument by *Alfred S. Reed* and *Lowell C. Noyes* of Chicago.

The following opinion was filed June 21, 1939:

FAIRCHILD, J. This is a question of *meum et tuum,* arising between an employer and his employee. The dispute is

over the ownership of a patent, No. 1,964,440, which stands in the name of the defendant Patch. The plaintiff claims to be entitled to an assignment because the invention was developed while Patch was in its employ. The defendant contends that the plaintiff's only interest in the invention is a nonexclusive right to use it in the machines which are manufactured at the plaintiff's factory. He claims that the patent remains his property and that the plaintiff is not entitled to an assignment. The findings of fact indicate what testimony the trial court regarded as the more credible, and the problem is to determine whether the facts disclosed by that evidence warrant a judgment directing assignment of the patent.

It appears that the contract of employment which the plaintiff entered into with Patch in 1922 did not require him to act as an inventor. John G. Seelig, who was general manager of the company when Patch entered its employ, testified as follows:

"*Q.* In your discussions with Mr. Patch when he first became connected with the company, was any reference made to patents? *A.* None that I know of.

"*Q.* Was there an understanding as to inventions if he made any? *A.* Nothing that I know of.

"*Q.* Did you ever tell Mr. Patch that if he made an invention, the company would own it? *A.* Do you mean the company would own the entire invention? I don't know as that question ever came up.

"*Q.* Mr. Patch did not represent that he was an experienced inventor? *A.* We hired him for that purpose so you can guess at the rest.

"*Q.* You mean that you told Mr. Patch that you thought he was an inventor? *A.* Inventor or developer, whatever you call it. That's what we needed.

"*Q.* Were you looking for a new product at that time in 1922 when Mr. Patch came with the company? *A.* A brand new product different than what we had.

"*Q.* But still in the washing machine field? *A.* We of course were looking to develop ours, improve that."

This testimony clearly indicates that there was no agreement with respect to patents when Patch first began working

for Barlow & Seelig Manufacturing Company. He was employed not in the hope that he would invent a new machine or a new mechanical movement, but with the expectation that he would develop and improve the product which the company was then manufacturing. Into such an employment contract an obligation to assign a valuable patent could be imported only by some positive act or stipulation. Hoar, Patent Tactics and Law, p. 189. In the absence of proof of some such act or stipulation it would be presumed that no understanding as to patent rights came into existence before Patch conceived his invention. The burden is upon the company to prove that the relationship of the parties was changed by their subsequent conduct.

After entering the employ of the company as a mechanical engineer, the defendant rendered whatever services were requested of him. It is true that as his engineering ability became more apparent he was relieved of the routine duties of a production superintendent and came to be regarded as a mechanical genius, engineer, and designer. But it does not appear in the testimony that the evolution which took place in the character of his employment went so far as to bind him to transfer to his employers an interest in a valuable invention. Few patents came into existence while he was in the employ of the plaintiff. He never did assign any patent to the company and whenever asked to assign the patent now in question he refused. In view of these facts no finding that there was a meeting of the minds on the assignment of patent rights could be upheld.

The plaintiff states its contention to be "that where a person, such as the defendant in this case, is employed specifically for the duties customarily discharged by a mechanical engineer, any inventions arising out of such employment in the field of endeavor of the employer become the property of the employer, as distinguished from the defendant's contention that a general employee does not lose his patent rights and

the employer merely gains a shop right." The plaintiff's contention finds some support in the case of *Magnetic Manufacturing Co. v. Dings Magnetic Separator Co.* (7th Cir. 1927) 16 Fed. (2d) 739, but it is not in accord with the Wisconsin rule as stated in *Fuller & Johnson Mfg. Co. v. Bartlett* (1887), 68 Wis. 73, 85, 31 N. W. 747. In the *Fuller & Johnson Case* the invention was a tilting shoe device to be used on mowers. The trial court found that the inventor of this device had agreed to work at an increased salary with the understanding that his employer wanted to put upon the market a new mower, equal or superior to any other then being manufactured. He had agreed to devote to the accomplishment of this purpose his skill in devising and making improvements in agricultural machinery. The trial court ruled that the invention belonged absolutely to the employer. On appeal, this judgment was reversed. The court said that although upon the facts stated the law implied an agreement for a perpetual license from the inventor to his employer to manufacture machines embodying the invention, "the mere fact that, in making the invention, an employee uses the materials of his employer, and is aided by the services and suggestion of his coemployees and his employer in perfecting and bringing the same into successful use, is insufficient to preclude him from all right thereto as an inventor."

This decision was based in part upon *Hapgood v. Hewitt* (1886), 119 U. S. 226, 7 Sup. Ct. 193, 30 L. Ed. 369. The doctrine of that case may have been modified by later decisions, but not so as to entitle an employer to inventions in the absence of facts showing that the minds of the parties have met on the proposition of assigning patent rights. In *Standard Parts Co. v. Peck* (1924), 264 U. S. 52, 44 Sup. Ct. 239, 68 L. Ed. 560, relied upon by the respondent, there was an employment to accomplish a particular thing, with terms of payment based in part upon its accomplish-

ment. The rule is that the intention to give to the employer the exclusive benefit of the employee's inventive ability must appear either by stipulation in the contract of employment or by clear implication from the character of the employee's duties. *Dalzell v. Dueber Watch-Case Mfg. Co.* (1893) 149 U. S. 315, 13 Sup. Ct. 886, 37 L. Ed. 749; *United States v. Dubilier Condenser Corp.* (1933) 289 U. S. 178, 53 Sup. Ct. 554, 77 L. Ed. 1114.

When there is no employment to invent and no agreement to assign, the employer's interests are fully protected by the privileges and benefits of shop rights. There are two items of property involved, that of the employer who owns the product in its improved form, and that of the inventor, to whom the novel idea belongs. These property rights remain distinct from each other unless and until the inventor has agreed to assign his idea to the employer. If the idea has become embodied in the product of the employer, and in a sense mingled with it because the materials of the employer and the services of his workmen have been used in reducing it to practical form, the employer has a right to manufacture the improved product without paying royalties to the inventor. Thus he reaps the same advantage that he would have received if the employee had suggested an improvement which was not patentable. He may make use of the idea in so far as it constitutes an improvement, because he employed the inventor to improve his product, but the invention itself is something greater than a mere improvement. The invention as such belongs to the inventor. It is his to sell, either to his employer or to others if the employer is unwilling to pay for an assignment of the patent. "The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor." *Atlantic Works v. Brady* (1883), 107 U. S. 192, 200, 2 Sup. Ct. 225, 27 L. Ed. 438.

Considerable stress has been laid upon the fact that Patch used his employer's name in writing to patent attorneys. In view of the existence of the doctrine of shop rights, with which Patch appears to have been familiar, this use of the employer's name is not inconsistent with the refusal of Patch to surrender his rights as inventor.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment in accordance with this opinion.

WICKHEM, J., dissents.

A motion for a rehearing was denied, with $25 costs, on September 12, 1939.