Gerard W. MULDER, Plaintiff-Respondent,

v.

Norbert F. MITTELSTADT, William Mittelstadt, Mary C. Mittelstadt, and Plymouth Die-Mold, Inc., Defendants-Appellants.†

Court of Appeals

*No. 83–1635. Submitted on briefs April 30, 1984.—
Decided June 20, 1984.*
(Also reported in 352 N.W.2d 223.)

---

† Petition to review denied.

104

For the defendants-appellants, the cause was submitted on the briefs of *Mike P. Fortune* of *Colwin, Fortune, Colwin & Pomeroy, S.C.* of Fond du Lac.

For the plaintiff-respondent, the cause was submitted on the brief of *James E. Welker* and *Paul M. Ryan* of *Brennan, Steil, Ryan, Basting & MacDougall, S.C.* of Janesville.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

BROWN, P.J.   This is an appeal from a stockholder's derivative action. The trial court held that Norbert Mittelstadt had breached his fiduciary duty as a director of Plymouth Die-Mold, Inc. causing direct injury to the corporation. The appellants, the Mittelstadts and Plymouth-Die Mold, Inc., assert that the trial court erred in ordering certain monetary assessments against Norbert Mittelstadt as a result of this breach. We agree with the trial court's decision and affirm.

Plymouth Die-Mold, Inc. was incorporated on June 3, 1953. Capital stock was issued to all subscribers, which included Gerard Mulder and Norbert Mittelstadt. By June of 1976, Mulder owned 110 shares of stock, Norbert Mittelstadt owned 260 shares, William Pilz owned 200 shares and Raymond Colwin owned 10 shares. Thus, al-

though Norbert Mittelstadt owned the most shares, he did not control the majority of shares.

In early 1976, Pilz approached Norbert Mittelstadt and offered to sell him the 200 shares of stock Pilz owned. Mittelstadt did not accept his offer. Pilz next approached Mulder and made him the same offer. Mulder and Pilz agreed that Mulder would buy 175 shares and that the remaining 25 shares would be sold to Norbert Mittelstadt, resulting in equal stock ownership between Mulder and Mittelstadt. Mulder wrote to both Pilz and Mittelstadt setting forth the proposed agreement and the price per share of $100. Mulder received no response from Mittelstadt.

There followed a series of events in response to Mulder's letter. These actions are reflected in what purports to be the minutes of special meetings of the board of directors of Plymouth Die-Mold.

In the first of these special meetings alleged to have occurred on May 28, 1976, Mittelstadt authorized the corporation to purchase Pilz' 200 shares and Colwin's 10 shares as treasury stock. The purchase price was $100 per share. The minutes show the meeting was attended by Norbert Mittelstadt and William Pilz.

The second meeting, which supposedly took place the next day, was said to have been attended by Norbert Mittelstadt, William Mittelstadt and Mary Mittelstadt. A resolution was passed authorizing the sale of 30 shares of treasury stock to William Mittelstadt at $100 per share in recognition of his contributions to the corporation. The stock would be paid for by a $3,000 reduction of the corporation's indebtedness to Norbert Mittelstadt. Neither Mary Mittelstadt nor William Mittelstadt were directors at the time of this resolution.

The next special meeting took place on June 8th. The minutes reflect that Norbert Mittelstadt and William Pilz were present, and Ray Colwin was absent. The board ac-

cepted Colwin's resignation and appointed Mary Mittelstadt as a director. Upon Pilz' motion, Mary Mittelstadt was elected secretary of the corporation. The board also accepted Pilz' resignation and elected William Mittelstadt as a director and vice president/treasurer.

At trial, Pilz denied attending any of the 1976 meetings of the shareholders or board of directors. The trial court, in finding Pilz to be a credible witness, determined that these meetings only took place in "someone's vivid imagination." It found that the minutes of these meetings were "concocted after plaintiff started to question the action taken by the Mittelstadts."

Pilz was paid in full for his stock in October 1976 by a check drawn on the corporation's account.

Mary Mittelstadt was issued 140 shares of treasury stock after a 1980 special meeting of the board of directors. Payment was made by cancellation of the corporation's indebtedness to Norbert Mittelstadt in the amount of $14,000.

In addition to receiving $20,000 for his 200 shares of stock, Pilz also received $15,000 between July 26, 1977 and May 26, 1978 in payment for bonuses accrued between 1968 to 1970. During this same period, Norbert Mittelstadt was authorized to receive bonuses of $22,500.[1] The corporate minute book, however, failed to show any action by the board of directors establishing bonuses for any employee from 1968 to 1970. In fact, until the retroactive action of 1977, the corporate minute book showed no bonuses after May 20, 1963.

After not hearing from Norbert Mittelstadt in response to his letter. Mulder wrote another letter on August 18, 1976 to Mary Mittelstadt reviewing his agreement with

---

[1] The record shows Norbert Mittelstadt never actually received this money; the sum remained outstanding as a corporate indebtedness to him. The treasury stock "sold" to William and Mary Mittelstadt was paid for by a reduction in this indebtedness.

Pilz and enclosing a down payment check to Pilz for $3,500. This check was still outstanding at the time of trial.

Mulder brought this action seeking both specific performance of his agreement to purchase the Pilz stock and, as a stockholder, a derivative claim seeking both repayment of the bonuses and the setting aside of the sale of treasury stock to William Mittelstadt and Mary Mittelstadt. The trial court denied Mulder's specific performance request, holding that there was no clear acceptance of the terms of the stock sale by Norbert Mittelstadt. Without evidence of an acceptance, there was no oral contract which could be enforced by a decree of specific performance.

Turning then to the stockholder's derivative action, the trial court found that Norbert Mittelstadt had acted in an intentional and willful way to deprive Mulder of his interest in the corporation.

All of the Mittelstadts were intimately involved with the corporation. Mary served as a long-time office manager. William was also an employee. Additionally, he used the first floor of the corporation's facilities for the refinishing and sale of antiques, without the approval of the board of directors. As for Norbert Mittelstadt, not only was he an original subscriber, he also devoted his time to designing molds for production by the corporation. For over twenty years, he devoted his fulltime attention to the corporation serving as a director, officer and employee.

The trial court found that because of this intimate relationship, "Norbert Mittelstadt, Mary Mittelstadt and William Mittelstadt considered Plymouth Die-Mold, Inc., as their private fiefdom and operated it solely for their financial gain to the detriment of the corporation and its minority shareholders. . . . [T]hey were of the opinion that plaintiff was to receive no benefit from the corpo-

ration because he had never contributed any physical labor."

The trial court found much of the activity of the corporation was *ultra vires* and ordered the following:

(1) Payment of $18,652.25 by Norbert Mittelstadt to the corporation. (This was the excess of the purchase price of the Pilz stock over the retained earnings of the corporation which was available for such use at the time of the purchase).

(2) The sale of the treasury stock to the Mittelstadts be set aside and that the stock be transferred back to the corporation.

(3) Payment of $15,000 in damages by Norbert Mittelstadt to compensate the corporation for a bonus paid to Pilz on Mittelstadt's authorization without proper corporate authority.

(4) William and Mary Mittelstadt's appointment to the board of directors be set aside because they were not properly elected according to the corporation's bylaws or Wisconsin statutes.

(5) That Mulder be given an opportunity to purchase treasury stock of the corporation to the extent of a 50% interest in the corporation.

The court also assessed $3,050 in punitive damages against Norbert Mittelstadt and $7,737.64 in reasonable attorneys fees and expenses. This appeal followed.

The appellants, the Mittelstadts and the corporation, allege several grounds of error in their appeal. These will be determined *seriatim*.

First, the appellants challenge the trial court's order that Norbert Mittelstadt reimburse the corporation for the $15,000 in bonuses paid to Pilz. Specifically, they assert that regardless of whether the bonuses were authorized by the corporation at a properly called meeting,

the compensation is valid as long as valuable services were rendered by the individual. They cite *Gauger v. Hintz*, 262 Wis. 333, 55 N.W.2d 426 (1952), as authority for this proposition.

The court in *Gauger* stated:

[T]he fact that there was no valid directors' resolution or contract in existence authorizing the increased compensation drawn by these defendants does not mean that they are not entitled to pay for the services rendered by them. Such services were not rendered by them in performing the duties of directors and officers, but rather in the capacity of skilled executives in operating a large and thriving business.

*Id.* at 348, 55 N.W.2d at 434. Therefore, had it been established that Pilz' bonuses were reasonable compensation for services rendered, he would have been entitled to receive these bonuses under an implied contract theory. *Id.* The appellants concede, however, that no evidence other than Pilz' own self-serving statement was received establishing the value of the services rendered. The burden of proof for establishing the reasonable value of such services is on the defendant. *Id.*

The trial court's finding of fact will not be set aside unless clearly erroneous. Sec. 805.17(2), Stats. The trial court specifically noted in its decision that the defendant failed to establish that the payment of the bonuses was reasonable compensation for services rendered. We hold that this finding is supported by the record.

The appellants next assert that should the repayment be sustained, Pilz, not Mittelstadt, should be required to repay this amount. Pilz is not a party to this action. The trial court had no power to enter a judgment against him. It was Norbert Mittelstadt's obligation, therefore, to repay the corporation.

■

The appellants' second argument on appeal is that the trial court erred in requiring Norbert Mittelstadt to pay compensatory damages of $18,652.25 to the corporation *and* ordering the return of the treasury stock (which was transferred to Mary and William Mittelstadt). They maintain that permitting the corporation to recover the $18,652.25 and also to regain ownership of the 210 shares of treasury stock would result in the corporation being made more than whole. Not only will the corporation be able to regain the treasury stock, the appellants contend, but it also will be reimbursed for much of the money expended to purchase this stock. The appellants assert that if Norbert Mittelstadt is required to reimburse the corporation for money expended in buying the treasury stock, "he should then be entitled to *retain* 187 shares of treasury stock of the corporation."[2]

■

The appellants are attempting to combine two different trial court determinations. First, with regard to the stock purchase, the trial court determined the corporation's acquisition of the 210 shares was contrary to both sec. 180.385 (1) (c), Stats.,[3] and the corporation's bylaws.

---

[2] The record indicates that Norbert Mittelstadt never obtained shares of treasury stock; the stock was purportedly transferred to William and Mary Mittelstadt and paid for by a reduction in the corporation's indebtedness to Norbert Mittelstadt. This bolsters the trial court's finding that these activities were motivated by the self-interest and self-dealing of Norbert Mittelstadt.

[3] Section 180.385(1)(c), Stats., provides as follows:
RIGHT OF CORPORATION TO ACQUIRE AND DISPOSE OF ITS OWN SHARES. (1) Unless otherwise provided in the articles of incorporation, a corporation shall have the right to purchase, take, receive, or otherwise acquire, hold, own, pledge, transfer, or otherwise dispose of its own shares; provided that no such acquisition, directly or indirectly, of its own shares for a consideration other than its own shares of equal or subordinate

The trial court was without the power to void the transaction as Pilz, the seller of the stock, was not a party. Therefore, pursuant to sec. 180.40 (1) (b), Stats.,[4] the trial court ordered Norbert Mittelstadt to reimburse the corporation for the difference between the purchase price of the stock and the retained earnings of the corporation.[5] This amount was $18,652.25.

rank shall be made unless all of the following conditions are met:
. . . .

(c) 1. Such acquisition is authorized by the articles of incorporation or by the affirmative vote or the written consent of the holders of at least a majority of the outstanding shares of the same class and of each class entitled to equal or prior rank in the distribution of assets in the event of voluntary liquidation; or

2. Such acquisition is authorized by the board of directors and the corporation has unreserved and unrestricted earned surplus equal to the cost of such shares. To the extent that earned surplus is used as the measure of the corporation's right to acquire its own shares, earned surplus shall be restricted until such restriction is removed by shareholder vote or consent as aforesaid, but such restriction shall be removed without any further corporate action a. to the extent of the consideration subsequently received upon the sale of any such shares or upon the sale of shares of the same class not held in treasury, or b. to the extent that earned surplus is reduced upon the payment of a stock dividend in treasury shares or authorized but unissued shares, or c. to the extent that earned surplus is transferred to stated capital or capital surplus.

[4] Section 180.40 (1) (b), Stats., states:

Directors of a corporation who vote for or assent to the purchase of its own shares contrary to the provisions of this chapter or contrary to any restrictions contained in the articles of incorporation shall be jointly and severally liable to the corporation for the amount of consideration paid for such shares which is in excess of the maximum amount which could have been paid therefor, without a violation of the provisions of this chapter or any restrictions in the articles of incorporation.

[5] The appellants, in their reply brief, raise a new argument, namely, that the trial court misinterpreted the provisions of sec. 180.385 (1) (c) 1. and 2., Stats., in requiring Norbert Mittelstadt to reimburse the corporation for the treasury stock pur-

Second, the trial court found that the acquisition of treasury stock by Mary and William Mittelstadt was invalid for several reasons. The actions taken by the board of directors at these meetings, including the sale of treasury stock, were voided because there was never a legal quorum of validly appointed directors of the corporation at a properly called meeting. Also, the sale of the treasury stock was without consideration. This stems from the trial court's finding that Norbert Mittelstadt's bonuses (totaling $22,500) for the period from 1968 to 1970 were never legally authorized. Because the treasury stock was paid for by a $17,000 reduction in this non-existent debt, the court held the stock transfer null and void and ordered the shares returned to the corporation within sixty days.

We see no error in the trial court's reasoning or decision. The court was merely trying to reimburse the corporation for two separate illegal events—the unauthorized purchase of treasury stock from Pilz and the unauthorized sale of treasury stock to Mary and William Mittelstadt.

---

chase. The appellants maintain that the trial court required that *both* subsections 1. and 2. of sec. 180.385(1)(c) be complied with in order to purchase its own shares of stock. The appellants are misreading the trial court's decision. The trial court stated:

As written, § 180.385(1), Stats., imposes *three* separate conditions that must be fulfilled before a corporation acquires of its own stock.

The defendant corporation's acquisition . . . *failed* to fulfill the *condition* imposed by § 180.385(1)(c)1. *&* 2., Stats. [Emphasis added.]

This excerpt shows the trial court understood that there are three conditions to be fulfilled (sec. 180.385(1)(a), (b) and (c)). Further, the court used the singular word "condition" when referring to sec. 180.385(1)(c)1. and 2. We read this portion of the trial court's decision to say that the appellants failed to fulfill *either* condition imposed by sec. 180.385(1)(c).

We now reach an issue grounded on equity principles. The trial court, in its decision, ordered that Mulder be given the opportunity to purchase treasury stock of the corporation to the extent of a fifty percent interest. The balance of the treasury stock was to be made available to other interested parties according to statute. The appellants assert that the court was essentially drafting an agreement for the parties; this they contend is improper in a stockholder's derivative action.

■

Shareholder's derivative actions are actions in equity. *Becker v. Becker,* 66 Wis. 2d 731, 734, 225 N.W.2d 884, 885 (1975). Although we have found no Wisconsin case which expressly delineates our standard of review for this type of equitable remedy, it appears that the appropriate standard is one of abuse of discretion. *See Spellman v. Ruhde,* 28 Wis. 2d 599, 606, 137 N.W.2d 425, 429 (1965). An appeal to equity requires a weighing of the factors or equities that affect the judgment—a function which requires the exercise of judicial discretion. "The basis of all equitable rules is the principle of discretionary application." *Yuba Consolidated Gold Fields v. Kilkeary,* 206 F.2d 884, 889 (1953) (footnote omitted).

■

A trial court has the power to apply an equitable remedy as necessary to meet the needs of the particular case. *Prince v. Bryant,* 87 Wis. 2d 662, 674, 275 N.W.2d 676, 681 (1979).

[E]quity "has . . . never placed any limits to the remedies which it can grant, either with respect to their substance, their form, or their extent; but has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case." 1 Pomeroy, Equity Jurisprudence, § 111. Equity has "power to enlarge the scope of the ordinary forms of relief, and even to contrive new ones adapted to new circumstances."

*Ibid.* § 116. If the customary forms of relief do not fit the case, or a form of relief more equitable to the parties than those ordinarily applied can be devised, no reason is perceived why it may not be granted.

*Meyer v. Reif,* 217 Wis. 11, 20, 258 N.W. 391, 394 (1935).

Equity can, at times, do complete justice in the resolution of the controversy before the court, and the court will use the remedy in order to prevent the same controversy in the future. *See Fullerton Lumber Co. v. Torborg,* 274 Wis. 478, 485, 80 N.W.2d 461, 465 (1957); *Mitchell Realty Co. v. City of West Allis,* 184 Wis. 352, 370, 199 N.W. 390, 396 (1924).

The remedy employed here is one that would prevent the same controversy in the future. Once the treasury stock is returned to the corporation, only two shareholders will remain, Norbert Mittelstadt and Gerard Mulder. Norbert Mittelstadt will hold the majority of the shares. He is also the only remaining director. According to the corporation's bylaws, directors are elected at the annual meeting of the shareholders. In light of this, the trial court ordered a special meeting of the shareholders to elect a new board of directors.

As the holder of the majority of outstanding shares and the only remaining director, Norbert Mittelstadt would again be in a position to exploit his self-interest. Unless some restructuring action is taken, there remains the substantial risk that Norbert Mittelstadt will continue to engage in self-dealing to the detriment of the corporation.

The trial court acted in equity to insure that the corporation continues as a going concern and is governed according to the Wisconsin statutes and the corporation's bylaws. Otherwise, Norbert Mittelstadt could still reach his goal of total control of the corporation even though he had lost the lawsuit. Equitable action was necessary to

prevent this from happening. The trial court took this action to make sure there would not be a reoccurrence of a Mittelstadt majority unless acquired in a legal fashion. This remedy has a significant bearing on the resolution of the present controversy and was executed with Mittelstadt's past deeds in mind. We hold that the trial court properly exercised its discretionary power.

The appellants next challenge the award of litigation expenses. The appellants contend that because Mulder was primarily interested in enforcing an individual right (becoming a fifty percent shareholder), he should be responsible for his own attorneys fees. This argument has no merit. The court explicitly recognized this action as a shareholder's derivative action. Under sec. 180.405(3), Stats.,[6] the court may award a successful plaintiff the reasonable expenses of maintaining the action, including reasonable attorneys fees.

The appellants' next argument, also meritless, concerns the trial court's finding that Mulder's rights, as *minority stockholder*, were wantonly, willfully or recklessly disregarded. This they assert is insufficient to sustain an award of punitive damages to the corporation. Rather, they argue that the court must find wanton, willful or reckless disregard of the *corporation's* rights. However, the court's opinion makes clear that but for a lack of evidence of Mittelstadt's ability to pay, "[d]efendant's deliberate and malicious acts which caused depletion of the

---

[6] Section 180.405(3), Stats., provides:

If anything is recovered or obtained as the result of the action whether by means of a compromise and settlement or by a judgment, the court may, out of the proceeds of the action, award the plaintiff the reasonable expenses of maintaining the action, including reasonable attorneys' fees, and may direct the plaintiff to account to the corporation for the remainder of such proceeds.

*corporation's* capital by the payment of non-existent bonuses and the gifts of stock would support a substantial award." (Emphasis added.) In another part of the decision, the court stated, "[a]s a result of Norbert Mittelstadt's intentional and willful violations of his fiduciary duty, the *corporation* has been directly injured by a depletion of its assets and is entitled, in this derivative action, to compensatory damages. Further, Norbert Mittelstadt's actions are of such a character as to warrant the awarding of punitive damages to the *corporation.*" (Emphasis added.) We hold the record adequately supports the punitive damages award.

Finally, the appellants maintain justice has been miscarried and reversal is warranted. However, they have not raised any additional allegations other than the issues previously discussed as to *why* justice has been miscarried. We have found each of these previous arguments to be without substance. "Adding them together adds nothing. Zero plus zero equals zero." *Mentek v. State,* 71 Wis. 2d 799, 809, 238 N.W.2d 752, 758 (1976).

*By the Court.*—Judgment affirmed.